NOT FOR PUBLICATION

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY
## CAMDEN VICINAGE

|  |  |  |
|---|---|---|
| JASON E. McKINNON, | : | Civ. Action No. 21-1849 (RMB) |
|  | : |  |
| v. | : | **OPINION** |
|  | : |  |
| CINDY SWEENEY, et al., | : |  |
|  | : |  |
| Respondents | : |  |
|  | : |  |

RENÈE MARIE BUMB, CHIEF UNITED STATES DISTRICT JUDGE

This matter comes before the Court upon Petitioner Jason E. McKinnon's ("Petitioner") petition for a writ of habeas corpus under 28 U.S.C. § 2254, where he challenges his 2009 New Jersey state court conviction for drug trafficking and related crimes. (Pet., Dkt. No. 1.) Respondents filed an answer in opposition to habeas relief. (Answer, Dkt. No. 6.) For the reasons set forth below, the Court denies the petition for writ of habeas corpus.

## I. PROCEDURAL HISTORY

On June 11, 2009, Petitioner, who was tried with his co-defendant Gary Maddox, was found guilty by a jury in New Jersey Superior Court, Law Division, Camden County of the following: racketeering in violation of N.J.S.A. § 2C:41-2; conspiracy in violation of N.J.S.A. § 2C:5-2; leader of narcotics trafficking network in violation of N.J.S.A. § 2C:35-3; two counts of possession with intent to distribute CDS in violation of N.J.S.A. § 2C:35b(1), (2); possession of weapons during

commission of certain crimes in violation of N.J.S.A. § 2C:39-4.1(a); and certain persons not to have weapons in violation of N.J.S.A. § 2C:39-7(b).  (Ex. 36, Dkt. No. 6-38 at 2-3; Ex., 3, Dkt. No. 6-5 at 1.)  On August 7, 2009, the Honorable Lee A. Solomon, J.S.C., sentenced Petitioner to an aggregate term of life plus 15-years imprisonment, with a 30-year term of parole ineligibility.  (*Id.*)  Petitioner filed an appeal in the New Jersey Superior Court, Appellate Division ("Appellate Division") on November 30, 2010.  (Ex. 4, Dkt. No. 6-6 at 1.)  On July 8, 2013, the Appellate Division affirmed Petitioner's conviction and sentence.  (Ex. 9, Dkt. No. 6-11 at 1.)  On February 4, 2014, the New Jersey Supreme Court denied Petitioner's petition for certification.  (Ex. 13, Dkt. No. 6-14 at 1.)

Petitioner sought post-conviction relief, which was denied by the PCR Court.  (Ex. 18, Dkt. No. 6-20.)  The Appellate Division affirmed the PCR court (*id.*), but the New Jersey Supreme Court remanded to the PCR court for an evidentiary hearing.  (Ex. 23, Dkt. No. 6-25.)  The PCR hearing was held before the Honorable Michele M. Fox J.S.C., on October 19, 2018  (Ex. 52, Dkt. No. 6-54.), and the PCR court denied PCR relief on October 23, 2018.  (Ex. 25, Dkt. No. 6-27 at 3.)  On July 8, 2020, the Appellate Division affirmed the PCR court's denial of the PCR petition.  (Ex. 30, Dkt. No. 6-32.)  The New Jersey Supreme Court denied Petitioner's petition for certification on September 29, 2020.  (Ex. 34, Dkt. No. 6-36.)  Petitioner filed his petition for writ of habeas corpus on or about February 3, 2021, raising seven grounds for relief.  (Dkt. No. 1.)

## II.    APPELLATE DIVISION'S FINDINGS OF FACT ON DIRECT APPEAL

By statute, determinations of factual issues by a state court are presumed to be correct on habeas review.  28 U.S.C. § 2254(e)(1).  The habeas petitioner has the burden to rebut the presumption of correctness of the state court's findings of fact by clear and convincing evidence.  (*Id.*)  This Court presumes the correctness of the following findings of fact by the Appellate Division on Petitioner's direct appeal.

> The evidence accumulated against defendants during the investigation conducted by the Drug Trafficking South Unit (DTSU) of the New Jersey State Police (NJSP) was overwhelming. The evidence included the testimony of Nasser Perez, a drug supplier arrested when he traveled to Arizona to obtain five kilograms of cocaine to sell to defendants; the testimony of Bennett Goodin and Jonathan Flick, two "runners" who were recruited to distribute drugs for defendants; the testimony of officers who conducted surveillance and monitored conversations between an informant and defendants that included multiple controlled purchases; transcripts of telephone conversations intercepted pursuant to court-authorized wiretaps in which defendants made numerous incriminating statements that provided extensive details about their trafficking activities; and the recovery of drugs, money, guns, and other corroborating evidence following the execution of search and arrest warrants.
>
> Detective Frederick Hunter, assigned to the DTSU of NJSP, testified that he had been involved in over two hundred eighty drug investigations in his career. He had worked as  primary investigating detective and in an undercover capacity, and became familiar with street names for drugs, their prices, packaging, and quantities sold.
>
> In the spring of 2006, Hunter conducted surveillance of the above informant, who had been under investigation for trafficking in cocaine. After observing interactions between him and defendant Maddox, the officers approached the

above informant and inquired about his relationship with Maddox. He confirmed that the relationship involved narcotics transactions and agreed to become an informant. The informant consented to have NJSP review his telephone records and listen to his telephone calls through the following procedure:  When Maddox called, the informant would let the call go to voicemail. The informant would then call the police before returning Maddox's call. By wearing an earpiece and holding the telephone in a pre-determined way, the informant allowed the police to hear both sides of the conversation and record it.

The first controlled purchase was made on May 18, 2006. The informant called Maddox and asked to buy two ounces of cocaine. Maddox agreed and instructed the informant to come to his residence on Shady Lane, in Washington Township, for the drugs.

Hunter listened in to the telephone conversation in which the purchase was arranged, and followed the customary procedure for a controlled purchase, i.e., searching the informant and his vehicle to confirm he had no drugs in his possession prior to the purchase; providing him with the agreed-upon amount of money; equipping the informant with an on-body recording device; keeping the informant under surveillance before and after the purchase; listening to the conversation between the informant and Maddox; and meeting the informant to recover the drugs after the purchase. Once the narcotics were recovered, they were taken to a secure location where they were field tested, logged into evidence, and secured. Hunter explained that the police used the same procedure each time they retrieved drugs from the informant: "[T]hey [were] secured, field tested, weighed by us . . . and then . . . [they were] secured in the Evidence Safe and taken to the state police lab." After the state lab confirmed that the substance was the drug in question, the drugs were transported to the federal Drug Enforcement Administration (DEA) Lab for further testing.

When the informant arrived at Maddox's residence on May 18, 2006, Maddox told him he was awaiting the

delivery of the drugs. Hunter observed Charles Muldrow, Maddox's nephew, arrive. Muldrow and the informant drove to an address on Walnut Avenue in Lindenwold, the residence of Maddox's child's mother. Hunter maintained surveillance and observed a cream-colored Chrysler, driven by Perez, pull up. Hunter overheard Muldrow tell the informant, "Wait, should be here momentarily." Muldrow got into the passenger side of the Chrysler, which then drove off around the corner and returned to the Walnut Avenue address. Muldrow then walked to the informant's vehicle and handed him a small object through the passenger side window. The informant met with Hunter at the pre-determined location and surrendered approximately two ounces of cocaine he had obtained from Muldrow.

The second controlled purchase occurred on May 31, 2006. Hunter listened in as the informant called Maddox and asked to buy four and one-half ounces of cocaine. Maddox told the informant he did not have that quantity but that he did have one ounce available. The same procedure for a controlled purchase was followed. With Hunter listening in, the informant went into Maddox's home and bought approximately one ounce of cocaine for $1100. The informant questioned Maddox about pricing, and asked if he could get a discount if he was able to bring Maddox multiple ounce purchases. Maddox replied that the informant was getting "the family price."

The third controlled purchase occurred on June 3, 2006. On the previous evening, Hunter listened in as the informant placed a call to Maddox. Lori Gephart, Maddox's live-in girlfriend, answered and told the informant, "We have what you are looking for[.]" The informant insisted on speaking to Maddox, who then repeated, "Yeah, we have what you're looking for, come on over." Hunter testified that he understood this to mean that Maddox had the four-and-one-half ounces of cocaine that the informant had requested. The procedure for a controlled purchase was followed once again, enabling Hunter to monitor the informant's purchase of approximately four ounces of cocaine from Maddox at his

residence through surveillance and the transmitting and recording device worn by the informant.

After the third controlled purchase, Hunter applied for a court order authorizing a "Dialed Number Retrieval" for the two telephone numbers Maddox used to contact the informant and gave to him to arrange for drug purchases. Dialed Number Retrieval allowed the police to examine the telephone numbers for incoming and outgoing calls for those numbers. By obtaining subscriber information, Hunter identified people who called Maddox at the numbers he used for drug transactions, including "Jay," defendant McKinnon; and Maddox's younger brother, Gerald Foster.

A fourth controlled purchase occurred on August 2, 2006. Monitored by Hunter, the informant called Maddox and asked to buy two ounces of cocaine. Maddox agreed and quoted the informant a price of $2200, but later called him back with a price of $2100. Because the amount purchased on June 3 weighed approximately four ounces, about one-half ounce less than the amount paid for, the informant confronted Maddox about it. Maddox told the informant he would make good on the outstanding half-ounce. Hunter followed the informant to the location where the purchase was to occur, a McDonald's parking lot on State Highway 42. He observed a tan pickup truck pull up next to the informant and overheard the driver tell the informant to get in the truck to go to another location. Pursuant to instructions given him by NJSP, the informant refused. Hunter was able to overhear the conversation as the driver contacted Maddox and told him the situation. Hunter also heard Maddox instruct the driver to have the informant follow him to an Exxon station. Hunter followed the informant and the pickup truck to the Exxon station, where he observed Maddox arrive with a white male in a green Ford Explorer. Hunter testified there was a white Crown Victoria, unrelated to the investigation, parked to the side of the Exxon station. After Maddox and the two other males engaged in what Hunter perceived to be an attempt to create confusion, Maddox walked to the informant and completed the drug sale.

The amount purchased weighed 36.1 grams, which was almost three-quarters of an ounce less than the agreed-upon amount of two ounces. The value of the "shorted" amount was $550. At Hunter's direction and under his supervision, the informant placed a series of calls to Maddox and then went to his home to confront him about the fact that he had supplied the informant less than the agreed-upon amounts. While the informant was wearing a transmitting and recording device, Hunter was able to hear Maddox apologize to the informant and explain that he had been nervous at the last sale, concerned there were police in the area, and had mistakenly given the informant a package that was for another customer. Maddox assured the informant that it was just a mistake, that he would make good on it, and said, "My family is cocaine." Maddox then told the informant about various methods he had for getting cocaine to sell to him, and told him that he transported cocaine from Arizona by hollowing out small appliances, inserting the cocaine in place of the parts, and shipping the appliances back to New Jersey.

Maddox also offered a sample of crystal methamphetamine to the informant. He told the informant that the price would be $250 per gram and offered him a reduced price of $175 per gram. Maddox said to the informant, "Don't tell nobody where this came [from]. Listen, when this shit comes out it's like an epidemic 'cause nobody never has it." Maddox also said to [the] informant, "Get that paper." Hunter interpreted this to mean that Maddox asked the informant to get prescriptions so he could sell prescription pills, such as Percocets and "Oxy's."

Another controlled purchase occurred on September 26, 2006. Hunter applied for and obtained court-authorized wiretaps on the two telephone numbers used and supplied by Maddox for the drug transactions. Gephart was the subscriber for one of the numbers. The subscriber for the second telephone number was Keith Rich, whom Hunter described as a "criminal associate" of Maddox. The court-authorized wiretap lasted from October 2006 to January 2007.

The next controlled purchase occurred on October 18, 2006. The informant called Maddox and asked to purchase three "eightballs," or three-eighths of an ounce of crystal methamphetamine. Maddox asked the informant why he had been out of touch for three weeks. The informant lied and said he had a "ministroke." Maddox instructed the informant to come to his house for the drugs. The informant did so.

Pursuant to Hunter's direction and while equipped with a transmitting and recording device, the informant asked Maddox for a price on a kilogram of cocaine. Maddox called McKinnon. Using "bird," street slang for one kilogram of cocaine, Maddox said he had a "bird drop for twenty-six thousand[.]" McKinnon told Maddox that "Naz" (Perez) usually charged him $22,000 to $24,000 per kilogram. They talked about who would deliver the kilogram to the informant. In a second call, made minutes later, McKinnon told Maddox to "go to storage, you got the storage key, all you got to do is go there and grab that shit." Maddox asked if McKinnon had anybody to use for the delivery. McKinnon said he could get "P" to do it, referring to Michael Scott, who was also known as "Powerful" or "P," but would have "to give him a couple dollars[.]"

Hunter observed the informant go to his car and remove the on-body recording and transmitting device. He also observed Gephart leave the house, drive around the neighborhood, and return to the house. She opened up the passenger door of a gray pickup truck parked in the driveway, placed a small object on the passenger floorboard, and walked back to the house. The informant then walked to the truck, retrieved a small item from the passenger floor board and returned to his car. He surrendered 10.2 grams of crystal methamphetamine and 3.4 grams of cocaine, the drugs purchased from Maddox, to Hunter at a predetermined location.

The informant called Maddox later and told him he would purchase a kilogram of cocaine for $26,000, the quoted price, but that he only had $20,000. Maddox later discussed the informant's request to purchase a kilogram

with Gephart. She was skeptical about the informant's stated reason for being out of touch, and said, "he's lying about this stroke thing." Maddox responded by describing the precaution he had taken to avoid being caught on a wire, saying, "In case he is lying, I wrote everything down on paper, I didn't say anything."

The informant did not complete the kilogram purchase with Maddox. Pursuant to Hunter's direction, he told Maddox in a telephone conversation on October 19, 2006 that he was "down in Cam," talked to a friend of his, and "picked it up" for "22,5." Maddox said, "That's what it is." When the informant asked what he meant, Maddox said, "The next one you need holler at me." Maddox subsequently had a telephone conversation with McKinnon regarding the informant's purchase. Maddox complained, he was like I found my man North Camden 22,500.00 if you can do that I'll deal with you all day . . . . Man we don't even need that. Ya know what I mean? You getting, you getting it, I'm doing what I'm doing you know what I mean if something passes our way and just some knuckle head that don't even need to be doing this shit then we do it like that or we just sell ounces of . . . that shit cause I know mother fuckers that buy ounces of that shit.

A call between Maddox and Foster was intercepted on October 20, 2006. Foster wanted to borrow money. Maddox said he just bought "500 fucking 80's, a whole bunch of shit today" and had sent Gephart to get a "pound from Gabe." As a result, Maddox was low on funds. Maddox and Foster also discussed a possible purchase of "30's," which Hunter testified were thirty milligram pills, from "Cherri." Maddox said the pills were probably not real, that "[t]hey are the ones with the M on them and they [are] the . . . morphine sulfate ones." He advised Foster that he did not have to pay Cherri money for the pills, that Foster should "tell that bitch you got some crack for her[.]" When Foster said that he was "about to have one of those 30's[,]" Maddox replied, "Well, I got pills there, everything, man." Maddox was about to leave and Foster asked him to "leave like a buck 50 in the mail box[.]" Maddox responded, "What the fuck you need money for

when I just now said I got all the fucking pills you need? That bitch don't want nothin' but some fucking crack."

Perez testified that Maddox's "main hustle" was selling pills, such as Xanax, Percocet and OxyContin, and that selling cocaine was "a side thing that he did." Maddox always had a "bag full" of pills. He told Perez that he trafficked in crystal methamphetamine as well, obtaining it from sources in Arizona and Mexico.

In a conversation intercepted on October 31, 2006, Maddox instructed an unidentified male on what to say to a doctor in Trenton to get prescription pills:

> [J]ust tell him your back is fucked up and you been taking OxyContin and your doctor ain't around and you ran out of your prescription and you heard about him and he'll write you out . . . some more Oxys and you also have panic attacks and you want Xanax and he'll give you 90 poles.

The unidentified male asked, "That's it just like that?" Maddox replied, "Yeah, and I'll give you the buck and a half for doing that for me." They then arranged to meet. In a telephone conversation later that day, Maddox told Foster that he went to Trenton that morning, only to "find out the damn doctor was closed on Halloween." He said he would now have to go back the following day. The evidence showed that, in addition to knowing how to obtain prescriptions from doctors, Maddox had knowledge of certain pharmacies' practices for filling out prescriptions. In a conversation with Scott, Maddox referred to "the Eckerd," saying, "that's a good place and … you ain't gotta worry about them calling[.]"

In an intercepted conversation with "Maurice," a pharmacist at the Farmacia San Antonio in Camden, Maddox said he just came back from the doctor and asked Maurice about his statement "that [he] couldn't take no more prescriptions from him[.]" Maurice replied, "No, it's alright. Ah, once in a while I take. What happens is too many people will call me and I'm trying to stay away from

that. But if you have one, yeah, I can take it." There were a number of intercepted conversations in which Maddox arranged to purchase or sell prescription pills. By way of example, on October 26, 2006, an unidentified male called him and said, "I got the OxyContin 40's." Maddox asked how much the caller wanted for them, tried to negotiate a price lower than "9," and asked how many there were. Told "90," Maddox said he wanted them, but when the unidentified male said the pills were "footballs," Maddox said,

> Hell, no, I can't do any generic . . . them generic football shaped ones, they ain't the real shits because they can't flip them yo. They want the real ones they can wipe the coating off and sniff. . . . I know this shit yo. This is my bread and meat, you know what I mean?

An order authorizing a wiretap of the telephone number McKinnon used to call Maddox was entered in mid-November 2006.

A call intercepted on November 25, 2006, between McKinnon and a male identified as "Eric" revealed that McKinnon had been in Amsterdam. Eric complained about a transaction he had in McKinnon's absence with a male who was later referred to as "Kill Bill" in the conversation. Eric stated, "he gave me all your coke dude, every bit of it[,]" and later said, "he gave me the bag a hundred piece and said split it . . . ." Eric said he told Kill Bill that he had "no money to pay for this" and said, "if there's gonna be a problem you need to take this back right now because I don't need it." According to Eric, Kill Bill refused and he later got a call from "P," who told him "next time you need something on the front, you just call me or call Jay." Eric said he told "P" that he was trying to do that but that this "n_____'s too sweet." Eric assured McKinnon that he was "not beating no one." In two other conversations between McKinnon and unidentified callers on that date and the following day, the callers discussed drug transactions they had with McKinnon's "boys" while he was away.

On November 26, 2006, McKinnon placed a call to James Giacomucci and said he "might have a job" for Giacomucci. McKinnon said, "I need you to break somebody's legs." McKinnon said, "[t]he dude … got beat" and "wants to know how much you goin' to charge him." Giacomucci said he did not want to meet the "dude" but wanted to know where the person lived before he gave a price. On the following day, McKinnon told Giacomucci, "[t]he boy's from Berlin" and that he "beat [McKinnon's associate] for a lot of Oxy's[.]" McKinnon said the price for "Oxy's" was "like . . . forty or fifty dollars." Giacomucci said, "Tell him to give me a grand, I'll make sure he don't walk." When Giacomucci said, "I can hit him anywhere I'll split his shit right there on the spot[,]" McKinnon said he did not want him "to kill nobody." Giacomucci clarified that he meant he would "take his knees out" and leave him "laid out like prone right on the fuckin' ground crying[.]" Giacomucci asked for additional information, including whether the intended victim was "packing," and stated he could use the money because he had $2500 bail.

In a conversation between Scott and McKinnon on the same date, they discussed doing "onions." Scott asked McKinnon, "You want to do more then [sic] an onion at a time on that?" McKinnon asked Scott how much he had sold and Scott replied that he could do with an "onion or two at a time[.]" McKinnon said, "Alright, we'll, do like 2 onions." They agreed that they had to "get workers." Scott said that a "young boy" talked to him and needed $300 for a warrant. Scott reported that he told him, "we'll pay for your warrant to get fix [sic] and you'll work it off."

The "young boy" referred to was Flick, who testified that in 2006, Scott, whom he also knew as "P" or "Powerful," approached him and his friend, Goodin, to sell drugs. At the time, he had no criminal record and was unemployed. However, he had a warrant outstanding for unpaid traffic fines. He testified that "Power and Jason said they would pay [his] fines off if he [sold drugs for them] for a little while and pay [him] for doing that, also." Flick was promised $1000 per week to sell "50-bags" and "100-

bags," quantities of cocaine and crack cocaine worth fifty dollars and one hundred dollars, respectively. He met McKinnon a week or two after he agreed. Flick was given a cell phone to receive calls from customers and worked from noon to 1:00 a.m., furnishing drugs to ten to twenty customers per day. Although promised $1000 per week, he was paid $500 per week and stopped working for McKinnon and Scott after approximately one-and-one-half months.

Goodin also testified that he had been recruited by Scott to sell drugs for McKinnon. Like Flick, he had no criminal record when Scott approached him. Goodin stated that Scott told him and Flick they would work every day, with Sundays off, and make $1000 per week. He received cocaine and crack cocaine packaged in 50-bags and 100-bags from either Scott or McKinnon and sold them to purchasers who contacted him on a telephone supplied by McKinnon. Goodin testified that he sold drugs for McKinnon and Scott for approximately one-and-one-half months, working from "[e]ight, nine o'clock in the morning till three, four o'clock at night, all day." He made sales to twenty to thirty customers per day. They were never paid $1000 per week. Instead, they were paid $500 and sometimes less. Goodin identified his voice and that of McKinnon in a taped telephone conversation in which he asked McKinnon for assistance regarding a drug sale.

In a telephone call between defendants intercepted on November 28, 2006, McKinnon asked Maddox if a price of $10,000 was worth it for five "500 OC 80s." Maddox advised against it. Maddox also told McKinnon he had "some hard" that he had "to get rid of" and asked, "You can do that for me, yo?" McKinnon asked how much he had and how much it weighed. Maddox said he did not know, that "it's all like 20's, bagged up, bro. Then I got like one that's 8 grams." McKinnon said they would weigh it out and he would see what he could do.

On November 30, 2006, McKinnon placed an intercepted call to Perez and told him that he thought he had "like nine stacks" for Perez but that he could "wait until after the weekend, to see how much [McKinnon gets.]" Perez

said he would "get it now" because he would be away after the weekend. McKinnon asked Perez, "you give Riz my number, like just in case if I need something or what ever?" Perez replied, "Yep … he here with me, he'll have this phone, actually."

Perez testified about his November 30 conversation with McKinnon. He explained that "nine stacks" meant $9000, and that this referred to money McKinnon owed him for drugs he had given to him previously. He testified further that "Riz" was his "right-hand man" and that he "was going to have [Perez's] phone so any of the customers that [Perez] had for weight or any of the other users that would call … he would make sure that the workers had the phones and made sure that they deliver the drugs." In conversations intercepted on December 2, 2006, McKinnon discussed an impending drug transaction near an Auto Zone store and said he was about to leave his "storage spot." NJSP officers conducting surveillance observed McKinnon at Mini-U Storage in Berlin, where a storage unit was rented in McKinnon's name. McKinnon was seen going into the facility, leaving approximately ten minutes later, and driving to the Auto Zone parking lot where he met with Foster.

McKinnon had conversations with Scott, Maddox, and an unidentified male that were intercepted on December 2 and 3, 2006, in which complaints were conveyed to McKinnon about cocaine he had supplied. The unidentified male complained that the cocaine was "rounded" and that he wanted a cheaper price if it was being "retouched." Maddox told McKinnon of a complaint made by an unidentified white male at the Golden Nugget Bar. Scott also told him, "You know when you sell weight, you can't have it all broken up. You don't know how to do it, man. You crushed it all up, a little too much." Scott instructed him that he had to have it "chunky monkey[,]" that "you put three gram of cut, all you need is a gram, from off the rock to crush up wit[h] it."

Perez testified that he initially obtained his drugs from Maddox's older brother, Jerald Green, who was known as

"Stef." Perez began selling cocaine and crack cocaine to McKinnon and Maddox in 2001. Initially, he sold McKinnon drugs in "8-ball" quantities, which is one-quarter ounce or 3.5 grams. Perez was arrested in 2002 for selling drugs and released from prison in 2003. He resumed selling drugs a few months later and started selling to both defendants as well as to Green. Perez was now able to sell larger quantities, selling McKinnon kilograms of cocaine and selling Maddox up to four-and-one-half ounce quantities. At first, Perez sold drugs directly to Maddox. However, at Maddox's request, Perez agreed to sell drugs to "Chuck," whom Maddox introduced as his nephew. In the fall of 2006 into January 2007, Perez typically supplied McKinnon with one kilogram of cocaine per week, charging him from $21,500 to $24,000 per kilogram. The sales were arranged on the telephone or in person.

Perez identified his own voice and that of both McKinnon and Maddox on several intercepted telephone conversations and testified about each of the conversations. One of the conversations concerned Perez's request to collect some of the $24,000 McKinnon owed him. In another, McKinnon stated he got a job, delivering auto parts, that made it easy for him to do "drizzy drops," which Perez explained meant dropping off drugs to customers. In the same conversation, McKinnon advised Perez that he had twelve or thirteen "stacks" for him, which Perez explained was twelve or thirteen thousand dollars that McKinnon owed him. Perez knew that McKinnon also had people who helped him sell drugs, including Scott, whom he introduced as "P," and someone called "Kill Bill."

On December 19, 2006, Perez asked McKinnon in an intercepted conversation if he "still had a lot of work left?" McKinnon replied, "not really" but said he "might have almost all that money that [he] owe[d]" Perez, that he was in Pennsauken "collecting a couple dollars." McKinnon stated further, "I'm definitely gonna need to get up with you, cause I'm almost running out[.]"

NJSP Detective David Lawyer conducted surveillance of McKinnon on December 26, 2006. He described McKinnon's actions, which, Lawyer stated, appeared to be narcotics transactions, in a McDonald's parking lot, and then at a laundromat, the Echelon Mall, a liquor store, a Rite Aid, and other places. Lawyer based his beliefs on "past experience," explaining that he had "seen hundreds [of narcotics transactions] done just that way in the past."

In a conversation intercepted on January 20, 2007, Perez told McKinnon that "things are looking bad, meaning [he did not] have a lot of coke to give him." He told McKinnon that he needed to collect money from him because he was "looking to make a move[.]" Perez testified that this meant he needed money to buy more drugs. Perez testified, "I was selling him weight as far as the kilograms of cocaine and he would break the kilogram down. Sometimes he would sell weight and sometimes he would sell bags." He cautioned McKinnon that if he sold "all his cocaine in weight then he won't have any bags for his customers, for bag customers, which is the main source of income." Perez explained that selling bags was more profitable than "selling weight":

> Weight is just a quick flip. If I bought a kilogram for 19,000 I could sell it for 21,000, you know. And that's $2,000 that I would make. However, if I took that same kilogram of cocaine for 19,000 and bagged it up into small bags I'll make like 40,000. So that's a big difference.

Perez testified that he sold weight to a lot of different people, but McKinnon was his "main, best customer[.]"

Shortly after this conversation, Perez traveled to Arizona to buy drugs, financed in part by $4000 he had received from McKinnon. Perez wanted to get a new source and McKinnon's brother, Green, was going to introduce him to a new connection, Blackstone. Such an introduction was necessary when operating on "that level . . . buying multiple kilograms of cocaine." Their arrangement was for Stef to fly out and Perez to drive in his pick-up truck,

which had a secret compartment on the side railings to conceal money en route to Arizona and the cocaine after purchase. Although Perez had ordered five kilograms from the new source, the supplier became suspicious and brought only three kilograms to the sale to avoid the higher penalties for a five-kilogram sale.

However, DEA had placed tracking devices on Perez's vehicles, and followed him to Arizona. Perez was arrested, along with Green and Blackstone, in Arizona on January 24, 2007 as the transaction was completed. Perez immediately admitted he went to Arizona to purchase drugs and to meet a new source. Perez pled guilty in federal court pursuant to a plea agreement to distribution of over five kilograms of cocaine, a charge that carried a possible sentence of ten years to life imprisonment.

On January 25, 2007, search warrants were issued for a number of locations,  including Maddox's residence and McKinnon's storage unit. Among the items seized at Maddox's residence were: (1) 0.52 grams of cocaine and 15.2 grams of marijuana; (2) cell phones; (3) money orders and receipts totaling $10,000; and (4) eight vehicles. From McKinnon's storage unit, the police recovered: (1) baggies used to package narcotics; (2) scales with white residue on them; (3) a strainer; (4) a control weight; (5) several bags and a safe containing what appeared to be marijuana; and (6) a Smith and Wesson .357 magnum revolver.

McKinnon was arrested at a Best Western hotel in Berlin, New Jersey, in possession of almost $5000, two bags of marijuana, four cell phones, a clear pipe used to smoke crack, and white pills believed to be Percocets. In McKinnon's wallet, the police found the title to a 2000 red Cadillac Escalade, which previously belonged to Perez. McKinnon also "had a bag of crack cocaine underneath his boxers, pretty much tucked underneath his genitalia." On the same day the warrants were executed, Maddox, McKinnon, Green, Gephart, Foster, Muldrow, Scott, Goodin, and Flick were arrested.

Daniel Brown, a special agent with DEA, was qualified as an expert in the methods, practices, and terminology used

in trafficking and distributing narcotics. He testified that
Arizona is a gateway for cocaine to enter the United
States. Cocaine is cheaper in Arizona than in New Jersey
since, due to security and transportation costs, the price
increases as the drug moves further from its source.
Because Arizona has a long growing season and many
remote areas for hiding farms, it is also a source state for
marijuana. In response to a hypothetical question, Brown
testified that the assortment of drugs and paraphernalia
found in McKinnon's storage locker was indicative of
distribution rather than personal use. Brown also
explained that the items found with McKinnon when he
was arrested were indicative of possession with intent to
distribute.

(Ex. 9, Dkt. No. 6-11 at 2–27 (alterations in original) (footnotes omitted)).

## II.    DISCUSSION

### A.    Standard of Law

The standard for granting a state prisoner's federal habeas corpus petition is

governed by 28 U.S.C. § 2254(d), as follows:

> [a]n application for a writ of habeas corpus on behalf of a
> person in custody pursuant to the judgment of a State
> court shall not be granted with respect to any claim that
> was adjudicated on the merits in State court proceedings
> unless the adjudication of the claim--
>
> (1) resulted in a decision that was contrary to, or involved
> an unreasonable application of, clearly established Federal
> law, as determined by the Supreme Court of the United
> States; or
>
> (2) resulted in a decision that was based on an
> unreasonable determination of the facts in light of the
> evidence presented in the State court proceeding.

The Third Circuit has directed habeas courts to follow a two-step analysis

under § 2254(d)(1).  *Rosen v. Superintendent Mahanoy SCI*, 972 F.3d 245, 253 (3d

Cir. 2020) (citing *Matteo v. Superintendent, SCI Albion*, 171 F.3d 877, 888 (3d Cir. 1999) (*en banc*), *cert. denied* 528 U.S. 824 (1999)).  First, courts should "determine what the clearly established Supreme Court decisional law was at the time Petitioner's conviction became final" and "identify whether the Supreme Court has articulated a rule specific enough to trigger 'contrary to' review." *Id.* at 253 (quoting *Fischetti v. Johnson*, 384 F.3d 140, 148 (3d Cir. 2004)).  "The 'clearly established Federal law' provision requires Supreme Court decisions to be viewed through a 'sharply focused lens.'" *Id.*  Clearly established law "refers to the holdings, as opposed to the dicta, of [the Supreme Court's] decisions as of the time of the relevant state-court decision." *Williams v. Taylor*, 529 U.S. 362, 412 (2000). A decision is "contrary to" a Supreme Court holding within 28 U.S.C. § 2254(d)(1), only if the state court applies a rule that "contradicts the governing law set forth in [the Supreme Court's] cases" or if it "confronts a set of facts that are materially indistinguishable from a decision of [the Supreme Court] and nevertheless arrives at a [different result.]" *Williams*, 529 U.S. at 405-06. Second, if Supreme Court precedent is not specific enough to trigger contrary review, habeas courts should "evaluate whether the state court unreasonably applied the relevant body of precedent." *Rosen*, 972 F.3d at 253 (quoting *Matteo*, 171 F.3d at 888)).

Under § 2254(d)(1), "an unreasonable application of federal law is different from an incorrect application of federal law." *Harrington v. Richter*, 562

U.S. 86, 101 (2011) (quoting *Williams*, 529 U.S. at 410). For relief under this provision, the state court's decision "evaluated objectively" must have "resulted in an outcome that cannot reasonably be justified under existing Supreme Court precedent." *Rosen*, 972 F.3d at 252 (quoting *Matteo*, 171 F.3d at 890)). A habeas court must frame the "relevant question as whether a fairminded jurist could reach a different conclusion." *Shinn v. Kayer*, 141 S. Ct. 517, 524 (2020) or, in other words, whether "every fairminded jurist would disagree" with the state court. *Mays v. Hines*, 141 S. Ct. 1145, 1149 (2021).

Habeas review is deferential to a state court's determination of facts. 28 U.S.C. § 2254(e)(1) provides that:

> [i]n a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.

"The petitioner must show that the state court verdict was based on an unreasonable determination of the evidence and that a reasonable factfinder could not have reached the same conclusion." *Rosen*, 972 F.3d at 252 (3d Cir. 2020) (citing *Campbell v. Vaughn*, 209 F.3d 280, 291 (3d Cir. 2000)). Habeas courts must "assess the reasonableness of the 'last state-court adjudication on the merits of the petitioner's claim." *Brown v. Davenport*, 596 U.S. 118, 141, 1463 (2022) (citing *Greene v. Fisher*, 565

U.S. 34, 40 (2011)).  When a state court summarily denies a claim on the merits, a habeas court

> must determine what arguments or theories … could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of this Court.

*Harrington v. Richter*, 562 U.S. 86, 102 (2011).  Finally, "[w]hen a state court has ruled on the merits of a state prisoner's claim, a federal court cannot grant relief without first applying" the harmless error standard "outlined in *Brecht* and the one Congress prescribed in AEDPA."  *Brown*, 596 U.S. at 122, 463 (2022).

### B.    Ground One

In Ground One of the petition, Petitioner alleges his trial counsel performed ineffectively in violation of the Sixth Amendment by failing to object to Juror No. 10 remaining on the jury.  (Pet., Dkt. No. 1 at 29-32.)  In the middle of trial, Juror No. 10 disclosed to the trial court that her friend, Leah Long, was the cousin of Lori Gephardt, who was co-defendant Gary Maddox's former girlfriend.  Gephardt was indicted along with Maddox and Petitioner, although she was not on trial with them.  Long had talked to Juror No. 10 about Gephardt's case before Petitioner's trial.

Juror No. 10 told the trial court she had not realized, until several days into the trial, that Petitioner's case was related to Gephardt's case, but Gephardt was on the State's witness list.  Petitioner's counsel failed to object to Juror No. 10 remaining on the jury, and he did not discuss the matter with Petitioner.  Petitioner asserts that he

was denied a fair trial because Juror No. 10 might have known that Gephardt was a

cooperating witness or Juror No. 10 might have had information about Gephardt's

involvement in the alleged conspiracy.  The proofs against Gephardt and Maddox

were intertwined with the proofs against Petitioner.  Neither the trial court nor

Petitioner's counsel asked Juror No. 10 about the specific information Long had

disclosed to Juror No. 10 about Gephardt's case.  Furthermore, Petitioner's counsel

failed to question the jury to determine whether Juror No. 10 imparted any

extraneous information to them.

Respondents oppose relief on Ground One of the petition.  (Dkt. No. 6 at 31-

42.)  During trial, Juror Number 10 reported to the trial court that her friend Leah

Long was the cousin of Lori Gephart, co-defendant Gary Maddox's girlfriend, who

was also indicted with McKinnon, Maddox, and many others.  The trial court

questioned Juror No. 10:

> The Court: Ms. Svoboda, why don't you tell us what
> happened? Did something occur last night, somebody say
> something to you?
>
> Ms. Svoboda: No. I mean -- I've never met Lori Gephart. I
> just -- my friend went to go live with her when we were like
> 13 for a brief period of time. And she had told me vaguely
> about Lori Gephart's case. I haven't heard anything about
> this case.
>
> The Court: This is in the past she's told you?
>
> Ms. Svoboda: Yes. And she talks to me about it once in a
> while because her aunt talks to her about it and her mother
> about it. It's her aunt's daughter. She talks to me about

Lori from time to time. But I didn't – I never knew her last name. I never made any real connection. But as the case went on when I heard that she was a CO and things like that, I kind of made the connection myself.

The Court: You know it's the same person?

Ms. Svoboda: Yes.

The Court: Have you discussed that fact with this friend of yours?

Ms. Svoboda: No. I did ask her her last name but I did it very casually. She doesn't know that I'm part of this case.

The Court: When was that?

Ms. Svoboda: That was last night because I became concerned. But, no, she doesn't know anything about this case.

The Court: Have you discussed this case with anybody at all?

Ms. Svoboda: No.

The Court: Have you discussed this case with any of the other jurors?

Ms. Svoboda: No.

The Court: Have you discussed this, I'll call it relationship, or this connection to Lori Gephart with any of the other jurors?

Ms. Svoboda: No.

The Court: There's nobody in the world aware of this at this point -- except us.

Ms. Svoboda: No.

(Answer, Dkt. No. 6 at 34-35, citing Ex. 44, 10T3-10 to 5-1.)

The trial court continued:

The Court: Counsel, any follow-up you want to ask?

Mr. Ragland [Maddox's counsel]: Could I have one second, Your Honor?

The Court: Sure.

Mr. Ragland: One question, Ms. Svoboda. Would you feel uncomfortable if Ms. Gephart took the stand and we had to take testimony from her?

Ms. Svoboda: I've never even seen her before.

Mr. Ragland: You've never met her?

Ms. Svoboda: No.

Mr. Ragland: No follow up.

Mr. Curley [the prosecutor]: The question the State has, I think the message as you related to the law clerk, was that you would feel uncomfortable going forward dealing with the cousin at functions?

Ms. Svoboda: That's the only thing that I may be uncomfortable with, is if I see her in the future and she recognizes me from here. I just don't want –

The Court: You mean Lori Gephart?

Ms. Svoboda: Yeah. I don't know that I ever will but that's my only concern.

> The Court: Keep in mind that Lori Gephart is not on trial here. She is only a witness.
>
> Ms. Svoboda: Right. Yes, I know.

(Answer, Dkt. No. *6* at 35-36, citing Ex. 44, 10T5-2 to 6-3.)

The trial court continued:

> The Court: And what happens here as far as I know would have no impact on Lori Gephart. Would you be able to evaluate her testimony and her as a witness fairly and impartially just as you did every other witness?
>
> Ms. Svoboda: Yes.
>
> The Court: Would this connection in any way affect your ability to be a fair and impartial juror in this case in your mind?
>
> Ms. Svoboda: No.
>
> The Court: You think you could continue to serve?
>
> Ms. Svoboda: I do, yes.
>
> The Court: Okay. Counsel, in light of those responses I would be inclined, unless you have some strong feeling one way or the other, to simply ask Ms. Svoboda to return to the jury room and have no further conversation regarding what we've discussed here today.
>
> Mr. Ragland: Your Honor, I think that's appropriate. Although I wouldn't want Ms. Svoboda to leave -- I'd like just a minute or two just to confer with my client and Mr. Snyder[.]
>
> The Court: Absolutely.
>
> Mr. Ragland: Okay.
>
> Mr. Curley: Thank you, Your Honor.

The Court: Mr. Snyder, any questions?

Mr. Snyder [petitioner's counsel]: No questions, Your Honor.

The Court: Any objection to her continuing to serve?

Mr. Ragland: Well, I want to reserve.

The Court: Oh, I know. Pending your discussions with your client.

Mr. Ragland: No objection.

Mr. Curley: No, Your Honor.

The Court: Ms. Svoboda, would you have a problem now returning to the jury room, but do not discuss what we've discussed here with anybody at any time, certainly not with the other jurors. Okay?

Ms. Svoboda: Okay.

The Court: Thanks for your candor and I appreciate your time.

Ms. Svoboda: Thank you.

(Answer, Dkt. No. 6 at 36-38, citing Ex. 44, 10T6-4 to 7-21.)

The trial court concluded:

The Court: Let's take a second. Everybody catch their breath. Counsel, just so you know, it does say in the note she expressed some discomfort but I think she's cleared that up by her testimony here that -- and I did explain to her that what happens here today, and I don't think it's inaccurate to say, has no impact on Ms. Gephart. It only has impact on the parties.

Mr. Curley: Correct.

The Court: All right. Let me know. I'll take a couple minutes, come get me when you're ready.

Mr. Ragland: Thank you.

(Answer, Dkt. No. 6 at 38, citing Ex. 44, 10T8-1 to 12.)  Gephart did not testify at trial.

Respondents submit they are unaware of any clearly established federal law requiring defense counsel to move to strike a juror when the juror has some remote connection to a potential witness.  Applying the appropriate deferential review of counsel's performance, Respondents contend the Appellate Division found that the trial judge's questioning of Juror No. 10 established that she was not tainted, and that she could continue to act as an impartial and fair juror.  Respondents note that "[a]n impartial jury consists of nothing more than jurors who will conscientiously apply the law and find the facts." (Dkt. No. 6 at 40, citing *Lockhart v. McCree*, 476 U.S. 162, 178 (1986) (emphasis and internal quotation marks omitted)).  Therefore, according to Respondents, the Appellate Division reasonably concluded that Petitioner's counsel was not ineffective, and Petitioner suffered no prejudice because there were no grounds for dismissing Juror No. 10.  The trial judge determined that Juror No. 10 would be impartial, and deference is owed to a trial judge's determinations based on judge's ability to observe the juror's demeanor upon questioning.  (*Id.* at 41, citing *Rosales-Lopez v. United States*, 451 U.S. 182, 188 (1981); *Ristaino v. Ross*, 424 U.S. 589, 594–95 (1976); *Connors v. United States*, 158 U.S. 408, 413 (1895)).

### 1.  Clearly Established Supreme Court Precedent

The Supreme Court, in *Strickland v. Washington*, set forth the elements of a Sixth Amendment ineffective assistance of counsel claim.  466 U.S. 668 (1984).  "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result."  *Id.* at 686.  The first element of a claim is deficient performance:

> [a] convicted defendant making a claim of ineffective assistance must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment. The court must then determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance. In making that determination, the court should keep in mind that counsel's function, as elaborated in prevailing professional norms, is to make the adversarial testing process work in the particular case. At the same time, the court should recognize that counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment.

*Id.* at 690.  Where "a state court has decided that counsel performed adequately[,]" habeas review of counsel's performance is "doubly deferential."  *Dunn v. Reeves*, 141 S. Ct. 2405, 2410 (2021) (citations omitted).  To meet this standard, the record must show "that counsel took an approach that no competent lawyer would have chosen."  *Id.* (citations omitted).

Even when counsel has performed in an objectively unreasonable manner, a state court judgment should not be set aside "if the error had no effect on the

28

judgment." *Id.* at 691.  Thus, for the second element of an ineffective assistance of counsel claim, a defendant must make a showing of prejudice.  To establish prejudice:

> [t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.

*Id.* at 694.  In determining prejudice, a court should, in most cases, presume "that the judge or jury acted according to law." *Id.*  A court determining prejudice should consider the totality of the evidence before the judge or jury. *Id.* at 695.  Thus, a court should accept the jury's findings that were unaffected by counsel's errors, take "due account of the effect of [counsel's] errors on the remaining findings," and ask if "the defendant has met the burden of showing that the decision reached would reasonably likely have been different absent the errors." *Id.* at 696.  Finally, a court determining an ineffective assistance of counsel may address the prejudice prong first, and if the defendant has failed to establish prejudice, the court need not determine whether counsel's performance was constitutionally deficient. *Strickland,* 466 U.S. at 697.

### 2.    The Highest Reasoned State Court Determination of the Claim

The highest reasoned state court determination of the claim is the Appellate Division's July 8, 2020 Opinion on PCR appeal, where the court held:

> Defendant has failed to satisfy either prong of the *Strickland* test. The voir dire conducted by the trial judge demonstrated that juror number ten was not tainted by what she may have heard from a friend and that she could continue to act as an impartial and fair juror. In that regard, the voir dire established that juror number ten did not know the potential witness, the juror had not discussed the case with anyone

else, including other jurors, and that she was confident that she could continue to sit as an impartial juror. Accordingly, defendant made no showing that his trial counsel acted ineffectively in not objecting to juror number ten continuing to sit as a juror. In addition, even if an objection had been made, defendant suffered no prejudice since there were no grounds for excusing juror number ten.

(Ex. 30, Dkt. No. 6-32 at 6.)

### 3.    Analysis

Petitioner has not identified a Supreme Court case that is factually similar enough for "contrary to" habeas review.  Therefore, the issue is whether the state court's determination of the claim involved an unreasonable application of the *Strickland* standard of ineffective assistance of counsel.  Petitioner speculates that Juror No. 10 *may not* have fully disclosed information she learned from her friend about Gephardt's criminal case, and Juror No. 10 *may have* had information that affected her ability to remain impartial in this case.  Similarly,  Petitioner asserts Juror No. 10 *may not* have been truthful when she told the trial court that she had not shared any information from her friend about Gephardt's case with the other jurors.

"Deference to the trial court is appropriate because it is in a position to assess the demeanor of the venire, and of the individuals who compose it, a factor of critical importance in assessing the attitude and qualifications of potential jurors."  *Uttecht v. Brown*, 551 U.S. 1, 9 (2007) (citations omitted).  Petitioner presents only speculation that Juror No. 10 may not have fully disclosed the nature of the information she received and whether she shared the information with anyone on the jury.  This is

insufficient to overcome the deference owed to the trial court's determination. Juror No. 10 said her friend had only "vaguely" talked to her about Gephart's case, and that it would not affect her ability to be impartial in this trial. She had not told the other jurors about her connection to Gephart or about anything she heard from her friend. The trial court found Juror No. 10 credible. Under the circumstances, competent counsel could have determined that the presence of Juror No. 10 would not prejudice Petitioner. Therefore, the Appellate Division's denial of the ineffective assistance of counsel claim did not involve an unreasonable interpretation of the *Strickland* standard. Ground One of the petition is denied.

### C.    Grounds Two and Three of the Petition

In Grounds Two and Three of the petition, Petitioner alleges erroneous jury instructions deprived him of his due process right to a fair trial. (Pet., Dkt. No. 1 at 32-35.) Petitioner was charged with conspiring with Gary Maddox to distribute controlled dangerous substances. In Ground Two of the petition, Petitioner alleges the trial court failed to instruct the jury that Petitioner's criminal liability must be determined by his own participation in the crime, and his own state of mind. Petitioner maintains that the jury instructions did not instruct the jury on how to assess whether Petitioner acted with a lesser degree of criminal culpability than his co-defendant, Maddox. The jury may have improperly attributed the actions of Petitioner's co-defendant to Petitioner because "they agreed to commit a distribution crime." Petitioner alleges this defective jury instruction permitted the jury to improperly conclude that he was a leader in a narcotics trafficking network.

Relatedly, in Ground Three of the petition, Petitioner alleges the trial court's confusing and erroneous instruction on the New Jersey statute, leader of a narcotics trafficking network, deprived him of his due process right to a fair trial. The trial court instructed the jury that "[t]he State must prove beyond a reasonable doubt that the petitioner acted as a supervisor of *at least one other person*" (emphasis added). The trial court, however, also instructed the jury that the State must prove beyond a reasonable doubt that Petitioner exercised supervisory power or control "over *others*" engaged in the drug trafficking conspiracy (emphasis added). Petitioner contends the instruction should not have included the reference to "one person" because the New Jersey Supreme Court interpreted the statute as requiring "supervisory power or control over others," meaning more than one person. Petitioner contends that the jury may have incorrectly concluded that Petitioner was guilty if he supervised only one person.

Respondents oppose habeas relief on Grounds Two and Three of the petition. (Answer, Dkt. No. 6 at 42-51.) Respondents note that the trial court instructed the jury on the leader of a narcotics trafficking network statute as follows:

> [A] person is a leader of a narcotics trafficking network if he conspires with two or more persons in a scheme or course of condut to unlawfully manufacture, distribute, dispense, bring into or transport in this State any controlled dangerous substance, classified in Schedule I or II, as an organizer, supervisor or manager of at least one other person.

(*Id.* at 46, citing Ex. 48, 14T123-17 to 124-2). The trial court then reviewed each of the four elements of the offense. As to the third element, the trial court charged the

32

State had to prove beyond a reasonable doubt that Petitioner "acted as an organizer, supervisor or manager of at least one other person." (Answer, Dkt. No. 6 at 46, citing Ex. 48, 14T125-25 to 126-3). As to the fourth element, the trial court explained,

> [T]he State must prove beyond a reasonable doubt . . . that the defendant held a high level position in the drug trafficking conspiracy. In other words, the State must prove the defendant occupied a position of superior authority or control over other persons in a scheme or organization of drug distribution, manufacturing, dispensing or transportation and that in that position the defendant exercised supervisory power or control over other persons in the drug trafficking conspiracy.

(*Id.*, citing Ex. 48, 14T127-3 to 12). This charge tracked the drug-kingpin model jury charge. (*Id.*, citing Model Jury Charge (Criminal), "Leader of Narcotics Trafficking Network ("drug-kingpin") (N.J.S.A. 2C:35-3) [For crimes committed after January 12, 1998] (2000)).

The trial court emphasized that the jury must find Petitioner had personally committed each of the component elements of the crime. The trial court further instructed the jury that they must consider the liability of Petitioner and Maddox separately. On direct appeal, the Appellate Division rejected all of Petitioner's arguments on the drug-kingpin instruction.

Respondents submit that Ground Two of the petition rests on the incorrect assumption that Petitioner was charged as an accomplice of Maddox. Petitioner and Maddox were charged in separate counts with first-degree leader of a narcotics-trafficking network, and neither was charged as an accomplice. The trial court gave

specific accomplice-liability instructions in connection with just two counts, and both solely concerned Maddox.

### 1.   Clearly Established Supreme Court Precedent

The Supreme Court, in *Estelle v. McGuire*, set forth the standard for habeas courts reviewing challenged state court jury instructions:

> The only question [on habeas review] is "whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process." *Cupp v. Naughten*, 414 U.S. 141, 147, 94 S.Ct. 396, 400–01, 38 L.Ed.2d 368 (1973); *see also Henderson v. Kibbe*, 431 U.S. 145, 154, 97 S.Ct. 1730, 1736–37, 52 L.Ed.2d 203 (1977); *Donnelly v. DeChristoforo*, 416 U.S. 637, 643, 94 S.Ct. 1868, 1871, 40 L.Ed.2d 431 (1974) (" '[I]t must be established not merely that the instruction is undesirable, erroneous, or even "universally condemned," but that it violated some [constitutional right]' "). It is well established that the instruction "may not be judged in artificial isolation," but must be considered in the context of the instructions as a whole and the trial record. *Cupp v. Naughten, supra,* 414 U.S., at 147, 94 S.Ct., at 400–01. In addition, in reviewing an ambiguous instruction such as the one at issue here, we inquire "whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way" that violates the Constitution. *Boyde v. California*, 494 U.S. 370, 380, 110 S.Ct. 1190, 1198, 108 L.Ed.2d 316 (1990).4 And we also bear in mind our previous admonition that we "have defined the category of infractions that violate 'fundamental fairness' very narrowly." *Dowling v. United States*, 493 U.S. 342, 352, 110 S.Ct. 668, 674, 107 L.Ed.2d 708 (1990). "Beyond the specific guarantees enumerated in the Bill of Rights, the Due Process Clause has limited operation." *Ibid.*

502 U.S. 62, 72–73 (1991).

### 2. The Highest Reasoned State Court Determination of the Claims

The Appellate Division denied Petitioner's challenge to the jury instructions as follows:

> The court's instruction on the leader of a narcotics trafficking network counts tracked the model jury charge. See Model Jury Charge (Criminal), "Leader of Narcotics Trafficking Network" (2000) (Model Jury Charge). "When a jury instruction follows the model jury charge, although not determinative, 'it is a persuasive argument in favor of the charge as delivered.'" State v. Whitaker, 402 N.J. Super. 495, 513-14 (App. Div. 2008) (quoting State v. Angoy, 329 N.J. Super. 79, 84 (App. Div.), certif. denied, 165 N.J. 138 (2000)), aff'd, 200 N.J. 444 (2009).
>
> The trial court first gave a charge on count three, the leader of a trafficking network charge against Maddox, and then gave virtually the same instruction regarding McKinnon. The court advised that the four elements the State was required to prove beyond a reasonable doubt were:
>
>> One, that defendant conspired with two or more persons. Two, that the purpose of the conspiracy included a scheme or a course of conduct to unlawfully manufacture, distribute, dispense, bring into or transport in this state [illegal narcotics].
>>
>> And, three, the defendant was an organizer, supervisor or manager of at least one other person, and, four, the defendant occupied a high level position in the conspiracy.
>
> [(Emphasis added).]
>
> Specifically addressing the third element, the court reiterated that in order to find defendants guilty, the jury needed to find that the State proved beyond a reasonable doubt that defendants were "organizer[s], supervisor[s], or

manager[s] of <u>at least one other person.</u>" (Emphasis added). Subsequently, in instructing the jury on the fourth element, the court explained that "a high level position in the drug trafficking conspiracy" meant that defendants occupied a position of superior authority or control over <u>other persons</u> in the scheme or organization of drug distribution or manufacturing, dispensing or transportation and that in that position the defendant[s] exercised supervisory power or control over others engaged in the drug trafficking conspiracy. [(Emphasis added).]

Defendants first contend that the trial court's instruction was contradictory and confusing because the court used the terms "at least one other person" and "others" in referencing people allegedly supervised by defendants. Defendants further argue that the language, "at least one other person," in explaining the third element of the crime conflicts with <u>State v. Alexander</u>, 136 <u>N.J.</u> 563 (1994), in which the Court stated a trial court "should instruct the jury that it must find that the defendant occupies a high-level position, that is, a position of superior authority or control over other persons, in a scheme or organization of drug distribution . . . and that in that position the defendant exercised supervisory power or control over others" in the network. <u>Id.</u> at 570-71 (emphasis added).

However, <u>N.J.S.A.</u> 2C:35-3 was amended in 1997 to state explicitly that the "organizer" role did not require supervision over more than one person. Therefore, at the time the offenses here were committed, the statute provided in pertinent part:

> A person is a leader of a narcotics trafficking network if he conspires with two or more other persons in a scheme or course of conduct to unlawfully . . . distribute . . . any controlled dangerous substance classified in Schedule I or II . . . <u>as a financier, or as an organizer, supervisor or manager of at least one other person</u>.

[(Emphasis added).]

Therefore, the court's use of "at least one other person" in explaining the third element of the crime was consistent with both the model jury charge and the statute as it existed when defendants' crimes were committed.

Although both the model charge and the court's instruction on the fourth element defined "a high-level position" as one in which the defendant "occupied a position of superior authority or control over <u>other persons</u>" and "exercised supervisory power or control over <u>others</u>[,]" <u>Model Jury Charge</u>, <u>supra</u>, (emphasis added), this disparity actually imposed a higher level of proof upon the State than that in the statute and thus clearly did not prejudice defendants. Moreover, even under the higher standard, the State's evidence was sufficient to prove that each of the defendants had multiple persons working for them, thereby satisfying the third and fourth elements of the charge regardless of the wording. Thus, there was no potential for an unjust result. <u>See</u> <u>Jordan</u>, <u>supra</u>, 147 <u>N.J.</u> at 426.

Defendants also argue that the court's instruction on being a leader of a narcotics trafficking network failed to inform the jurors that purchasers are not to be considered as a person over whom the defendant allegedly exercised authority or control. <u>See</u> <u>State v. Afanador</u>, 134 <u>N.J.</u> 162, 173 (1993) (<u>Afanador I</u>) ("The casual purchaser will not ordinarily constitute one of the 'others' with whom a defendant conspires, because in most cases a street distributor does not direct or supervise a drug buyer."). However, the charge explained that members of the networking organization over whom defendants exercised authority or control had to be involved in "a scheme or organization of drug distribution, manufacturing, dispensing or transportation[.]" Casual purchasers would not fall within that description and, as noted, there was ample evidence that defendants had a number of subordinates who worked for them.

Therefore, the omission of a further clarification that casual purchasers could not be considered part of the trafficking network was not plain error. <u>R.</u> 2:10-2.

> Defendants' remaining arguments regarding the jury
> charge on being a leader of a narcotics trafficking network
> lack sufficient merit to warrant discussion in a written
> opinion. R. 2:11-3(e)(2).

(Ex. 9, Dkt. No. 6-11 at 71–73 (alterations in original)).

### 3.    Analysis

An ambiguity in a jury instruction warrants habeas relief only if the error so

infected the entire trial with unfairness that the resulting conviction violated due

process.  Under New Jersey law, to establish the third element of  N.J.S.A. § 2C:35-

3, a jury need find only that a defendant was an organizer, supervisor or manager of

at least one other person *See State v. Berry*, 254 N.J. 129, 145 (2023) (discussing

amendments to statute and model jury charge).  If the jury erroneously believed they

were required to find Petitioner was an organizer, supervisor, or manager over more

than one person, this inured to Petitioner's benefit, and could in no way have

deprived Petitioner of the constitutional right to have the jury find each element of

the crime beyond a reasonable doubt.  *See In re Winship*, 397 U.S. 358, 364 (1970)

("the Due Process Clause protects the accused against conviction except upon proof

beyond a reasonable doubt of every fact necessary to constitute the crime with which

he is charged."))

The second part of Petitioner's challenge to the jury instructions involves

whether the jury was instructed to assess Petitioner's culpability separate from

Maddox's culpability. Significantly, the trial court instructed the jury:

> There are nine offenses charged in the indictment against
> Gary Maddox.  There are six offenses charged in the

indictment against Jason McKinnon. They're separate offenses of separate counts in the indictment. In your determination of whether the State has proven each defendant guilty of the crimes charged in the indictment beyond a reasonable doubt, each defendant is entitled to have each count considered separately by the evidence which is relevant and material to that particular charge based on the law as I give it to you.

You must also return separate verdicts for each defendant as to each of the charges being tried. In other words, you will have to decide each case individually. Whether the verdicts as to each defendant are the same depends on the evidence and your determination as judges of the facts.

…

Each offense and each defendant in this indictment should be considered by you separately. The fact that you may find a particular defendant guilty or not guilty of a particular crime should not control your verdict as to any other offense charged against that defendant and it should not control your verdict as to the charges against any other defendant.

(Ex. 48, Dkt. No. 6-50 at 42-43, 60-61.) Nowhere in the instructions is there any suggestion that the jury could attribute the alleged conspirators' conduct or states of mind to each other and find both guilty of the same charge. On the charge of leader of a narcotics trafficking network, the trial court read the instruction twice, first as to Count Three against Gary Maddox, and second as to Count Four against Jason McKinnon. The jury was properly instructed on separately finding each defendant guilty or not guilty on each charge. Therefore, the Appellate Division's denial of Petitioner's due process challenge to the jury instructions did not involve an

unreasonable application of the due process standard announced in *Estelle*. Grounds

Two and Three of the habeas petition are denied.

### E.    Ground Four of the Petition

### 1.    Petitioner's Argument

Petitioner asserts in Ground Four that

> [t]he State Court's Ruling that Petitioner Was Not
> Deprived of His Due Process Right to Confrontation as a
> Result of the Trial Court's Improper Admission of
> Hearsay Evidence and Accusations from Absentee
> Witnesses Was Contrary to Clearly Established Federal
> Law, and An Unreasonable Application of Federal Law,
> Therefore the Writ Should Issue.

(Pet., Dkt. No. 1 at 36.)  Petitioner only partially explained this claim in his habeas

petition and refers to his state court briefs for further support.  Petitioner presented

this argument in his counseled brief on direct appeal, relevant part:

> The State alleged that McKinnon and Maddox had
> entered into a criminal conspiracy and worked together to
> distribute CDS.  Cornely was asked about how he reached
> his testimonial conclusions regarding his interpretation of
> telephone calls. Cornely testified, "When you are doing
> these wiretap calls, you know, one call alone may not
> always be clear, but when you put it together with the
> whole investigation and the things that you've learned
> through the course of the investigation, usually it adds
> some clarity to it." (Italics added).
>
> . . .
>
> Specifically, Trooper Cornely testified that he intercepted
> McKinnon's telephone. According to Cornely, the cell
> phone was "very active." Cornely testified that McKinnon
> was selling a variety of narcotics, mostly crack cocaine.
> When Cornely was asked if he identified any people who

worked with McKinnon, Cornely testified, "There was two individuals [sic]. I can't recall their names, specifically, two younger guys that he was basically training to distribute, he had them actually out, I think at one point they even had this telephone facility. And he would basically utilize them to sell small packages of cocaine." Cornely also identified Michael Scott as "an individual who sometimes cooked up cocaine into crack cocaine for Mr. McKinnon and also distributed cocaine for Mr. McKinnon." When asked how much cocaine McKinnon was purchasing from Perez, Cornely testified, "We established it to be from half-a-kilo to a kilo a week." Trooper Cornely admitted that his testimony about the quantity of drugs being discussed on the telephone was based on "Everything that was going on in the course of the investigation."

…

Hunter testified that "Adam" was a subordinate of McKinnon. Trial counsel objected that the police "do not know who that Adam is."

… Hunter testified, in conclusory fashion that he overheard Maddox say, "I got to say its like Nas is his mentor, so I leave it as that." When asked what that meant, Hunter testified, "He meant Jason McKinnon was working for Nasser Perez, Nas was making money."

Hunter further concluded, from his investigation, that Keith Rich was "a criminal associate of Mr. Maddox's that resided in Blackwood." When asked who Gabe was, Hunter testified, "From our investigation, Gabriel Blackstone is a criminal associate of Gary Maddox." (Italics added). Hunter continued: "'P' is an alias for 'Powerful' or Michael Scott. That was one of Jason McKinnon's criminal associates and Mr. Maddox was suggesting that he and Mr. McKinnon could get Mr. Scott to actually do the sale of cocaine." According to Hunter, Maddox spoke with Jason McKinnon about prescription drugs.

Hunter also testified that Michael Scott would "work with Mr. McKinnon." The fact that Michael Scott was a

41

criminal associate of Jason McKinnon also was a conclusion that was the product of the "investigation," as Hunter provided no factual basis to show that he had first-hand knowledge.

Cornely identified "Gerard Foster" as one of the people Maddox used to sell drugs. According to Cornely, Foster would distribute various types of narcotics similar to what Lori Gephart was doing.  It is clear from Cornely's testimony that he was relying on facts gathered during the "investigation" to support his conclusions rather than first-hand observations.
…

Moreover, Davis testified that the vehicle he had been following, "had been known to be driven and utilized by Mr. McKinnon, enter within the storage facility."  Cornely, for example, testified, "There was two individuals [sic]. I can't recall their names, specifically, two younger guys that he was basically training to distribute, [McKinnon] had them actually out, I think at one point they even had this telephone facility."

(Ex. 4, Dkt. No. 6-6 at 74-82) (transcript citations omitted).

### 2.    The Answer

Respondents oppose habeas relief on Ground Four of the petition.  (Answer, Dkt. No. 6 at 51-55.)  Respondents assert that the alleged hearsay testimony was based on personal knowledge gained from the following:  arranging controlled buys between an informant and Maddox; surveillance of the alleged conspirators; listening to recorded conversations; and police presence in Arizona for the arrest of Nasser Perez.  Therefore, the challenged testimony was not based on testimonial hearsay of unconfronted witnesses.

### 1.    Clearly Established Supreme Court Precedent

*Crawford v. Washington*, 541 U.S. 36 (2004) and *Davis v. Washington*, 547 U.S.

813, 821 (2006) represent the clearly established Supreme Court precedent governing

Petitioner's Confrontation Clause claim at the time of the Appellate Division's 2013

Opinion rejecting Petitioner's Confrontation Clause claim.  In *Crawford*, the Court

held the Confrontation Clause of the Sixth Amendment bars "admission of

testimonial statements of a witness who did not appear at trial unless he was

unavailable to testify, and the defendant had had a prior opportunity for cross-

examination."  541 U.S. at 53-54.  In *Crawford*, the Court determined that only

"testimonial" statements "cause the declarant to be a 'witness' within the meaning of

the Confrontation Clause."  *Davis*, 547 U.S. at 821 (citing *Crawford*, 541 U.S. at 51).

Thus, not all hearsay falls within the protection of the Confrontation Clause.  The

Supreme Court provided the following guidance on whether or not statements are

testimonial:

> Statements are nontestimonial when made in the course of
> police interrogation under circumstances objectively
> indicating that the primary purpose of the interrogation is
> to enable police assistance to meet an ongoing emergency.
> They are testimonial when the circumstances objectively
> indicate that there is no such ongoing emergency, and that
> the primary purpose of the interrogation is to establish or
> prove past events potentially relevant to later criminal
> prosecution.

*Id.* at 822.  Also relevant to this claim, at the time of the Appellate Division's 2013

Opinion, federal harmless error review was governed by *Brecht*, which held that a

habeas petitioner is entitled to relief only if the error "had substantial and injurious

effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S.

619, 637 (1993) (quoting *Kotteakos v. U.S.*, 328 U.S. 750, 776 (1946)).

### 2.    The Highest Reasoned State Court Determination of the Claim

In 2013, the Appellate Division denied Petitioner's federal Confrontation

Clause claims:

> Defendants also challenge testimony by Hunter in which he described Rich,  Blackstone, and Scott as "criminal associates" of defendants, based upon the investigation. We agree that this testimony was improper. Use of the term, "criminal associates," conveyed the witness's conclusion that defendants were criminals. However, because there was no objection at trial, this challenge is subject to the plain error standard. R. 2:10-2.  Both the association among defendants and these individuals and the criminal nature of that association were evident from the intercepted conversations. Because the jury had evidence that permitted it to draw its own conclusions as to whether defendants engaged in criminal endeavors with Rich, Blackstone, and Scott, this was not a case in which the improper conclusory description depended upon information outside the record. In light of the substantial evidence in the record of defendants' guilt and of the criminal association described by Hunter, this testimony was not "clearly capable of producing an unjust result[.]" R. 2:10-2.

> Defendants challenge Cornely's testimony that: McKinnon's cell phone was "very active"; McKinnon was selling a variety of narcotics, mostly crack cocaine; "two younger guys that [McKinnon] basically was training to distribute" were identified as working with McKinnon; Scott was "an individual who sometimes cooked up cocaine into crack cocaine for Mr. McKinnon and also distributed cocaine for Mr. McKinnon"; they established that McKinnon was purchasing "from half-a-kilo to a kilo a week" of cocaine from Perez; he interpreted the intercepted conversations based on "[e]verything that was

going on in the course of the investigation"; and Foster was one of the people Maddox used to sell drugs. Defendants also challenge testimony from Davis that, in conducting surveillance, he followed a vehicle "known to be driven and utilized by Mr. McKinnon" and that he had "targeted" McKinnon as a suspect in the drug trade as early as December 4, 2006.

Although the defense at trial was vigorously pursued, no objections were posed to any of the statements now challenged on appeal. These challenges are therefore subject to review for plain error. R. 2:10-2. Contrary to defendants' contentions, the testimony challenged was not based upon facts outside the record. There was evidence, including intercepted conversations, the results of physical surveillance, and the testimony of Perez, Goodin, and Flick, to support these statements. The admission of this testimony was not plain error. The balance of defendants' arguments regarding alleged hearsay evidence in Point II of their briefs lack sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(2).

(Ex. 9, Dkt. No. 6-11 at 54-56.)

### 3.    Analysis

The first question in determining a Confrontation Clause claim is whether the challenged statements were of a "testimonial" nature.  If not, the testimony did not violate the Confrontation Clause.  "Surreptitiously monitored conversations and statements contained in [] Title III [wiretap] recordings are not "testimonial" for purposes of *Crawford*."  *United States v. Hendricks*, 395 F.3d 173, 181 (3d Cir. 2005) (citations omitted); *accord United States v. Bobb*, 471 F.3d 491, 499 (3d Cir. 2006).  "[S]tatements [made] in furtherance of a conspiracy" are "by their nature ... not testimonial[.]"  *Crawford*, 541 U.S. at 56 (alterations added).  Thus, party admissions and coconspirator statements in conversations with an informant are nontestimonial.

*United States v. Hendricks*, 395 F.3d at 183.  In more general terms, statements describing current circumstances, in contrast to those "designed primarily to 'establis[h] or prov[e]' some past fact" for future use in judicial proceedings, are nontestimonial.  *Davis*, 547 U.S. at 827.

Much of the testimony by Cornely and Hunter involved their recollections and interpretations of surreptitiously intercepted conversations involving Petitioner and/or his co-conspirators, where they discussed drug quantities purchased or sold, some of which related to controlled buys organized and carried out by Hunter using an informant.  (*See* Exhibits 40-44; Dkt. No. 6-42 at 53-171, Dkt. No. 6-43 at 3-117, Dkt. No. 6-44 at 3-149, Dkt. No. 6-45 at 10-77 (Hunter's testimony); Dkt. No. 6-45 at 77-106, Dkt. No. 6-46 at 6-28 (Cornely's testimony)).  The challenged out-of-court statements described drug transactions, which the declarants never expected for use in later judicial proceedings.  Therefore, even if hearsay, the statements were nontestimonial and not subject to the Confrontation Clause.

Even when an out-of-court witness's statement is testimonial in nature, the Confrontation Clause "does not bar the use of testimonial statements for the purposes other than establishing the truth of the matter asserted."  *Crawford*, 541 U.S. at 59 n.9.  For example, Petitioner challenges Detective Davis's testimony that he surveilled a vehicle known to be driven by Petitioner and saw it enter a particular storage facility.  (Ex. 44, Dkt. No. 6-46 at 30-33.)  Davis followed the vehicle, and when it stopped and the occupants exited, he was able to identify Petitioner.  Davis had conducted surveillance of the storage facility on other days, and he saw

Petitioner enter the storage facility on those occasions.  Davis was assigned as the team leader to execute an arrest warrant for Petitioner.  He received information later that day that the vehicle known to be driven by Petitioner was parked at a Best Western hotel.  Davis's testimony that he saw a vehicle known to be driven by Petitioner was not offered to prove the vehicle was driven by Petitioner, but to explain what led up to the police executing an arrest warrant on Petitioner at the Best Western hotel that day, and later searched Petitioner's storage facility.  "Police officers are permitted … to explain the background context for their arrival at a scene." *United States v. Price*, 458 F.3d 202, 210 (3d Cir. 2006).

Finally, even if admission of testimonial hearsay evidence violated the Confrontation Clause, the constitutional violation is subject to harmless error review by the state court, and the state court's harmless error determination must be provided deference on habeas review.  The factual findings by the Appellate Division on direct appeal, set forth in Section II, *supra*, establish that any violation of the Confrontation Clause by admission of hearsay evidence was harmless error.   In summary, the challenged testimony was corroborated by the following:  multiple monitored conversations and controlled buys between an informant and Maddox; surveillance of the alleged conspirators; listening to many surreptitiously recorded conversations; police presence in Arizona for the arrest of Nasser Perez, and evidence obtained upon the execution of search warrants, including Petitioner's storage facility.  The testimony of the investigating detectives was further corroborated by Perez's testimony that he sold cocaine to Petitioner for distribution,

47

and that Petitioner was his best customer.  Petitioner's role in the conspiracy was further corroborated by Flick's and Goodin's testimony that Petitioner and Maddox hired them to sell cocaine and crack.   Based on the quantity and quality of the admissible evidence, the Appellate Division's finding of harmless error involved a reasonable application of federal law.  Therefore, Ground Four of the petition is denied.

### F.    Ground Five of the Petition

Petitioner alleges in Ground Five of his petition that he was deprived of his due process right to a fair trial when the trial court permitted Cornely and Hunter to give their opinions of how the drug conspiracy worked, and they were permitted  to interpret recorded conversations, without any determination that they were qualified experts. (Pet., Dkt. No. 1 at 38-39.)  Specifically, Petitioner points to Cornely's testimony:  "[w]ell, we would constantly get calls between the two and he would tell Mr. Perez his status, how many stacks he had, by stacks it's thousands. We could tell he was getting – whether it took a couple of days, he'd have ten, 13 stacks put together.  We would kind of gauge how much he was buying and then he would meet him on certain occasions through the course of the week."  Petitioner asserts that lay jurors could not conclude that he was selling between half-a-kilo and a kilo a week based on the words "ten and thirteen stacks."

Petitioner also points to Hunter's testimony about an unidentified male who told Petitioner in a recorded phone conversation that one of his customers was possibly working with the police.  When asked why the unidentified male would say

that to Petitioner, Hunter testified "[b]ecause he obviously was working for Jason McKinnon."  The trial court permitted this testimony but struck the word "obviously."  When the trial court found that Hunter was qualified to render expert opinions, defense counsel for both defendants noted they had not received any expert reports from this witness.  The trial court stated, "[a]s to whether it's an expert opinion or not, the State's contention is that in his numerous transactions, and by the way, whether it's an expert opinion or not is moot because notice has been given."

Respondents oppose habeas relief on Ground Five of the petition.  (Answer, Dkt. No. 6 at 55-59.)  Respondents submit that the most significant testimony against Petitioner came, not from Cornely and Hunter, but from Nasser Perez, Jonathan Flick, Bennett Goodin, Special Agent Daniel Brown, and from the intercepted telephone recordings of Petitioner and Maddox, where they discussed the details of their respective drug-dealing operations.  Cornley's and Hunter's "opinion" testimony was corroborated by Perez's testimony that from 2003 to 2006, Perez sold ever-increasing amounts of cocaine to Petitioner, up to about a kilogram per week.  In a recorded conversation in January 2007, Petitioner told Perez that he had twelve or thirteen "stacks" for him.  Perez testified this meant Petitioner owed him $12,000 or $13,000 for drugs.  Furthermore, Flick and Goodin testified that they worked for Petitioner six days a week, delivering $50 and $100-bags of cocaine to buyers.  Special Agent Brown testified as a qualified expert about his knowledge of trafficking in cocaine, marijuana, methamphetamine, prescription medications, and methadone, all in corroboration of Hunter's and Cornely's lay opinions.  Brown testified that

eight ounces of cocaine and assorted paraphernalia, like that recovered from Petitioner's storage unit, would be for distribution, not personal use.  The jury also heard many recorded conversations involving Petitioner and Maddox, their associates, an informant, and potential buyers.  Thus, Respondents conclude Petitioner was not deprived of his due process right to a fair trial by admission of Cornely's and Hunter's opinions of how the drug conspiracy worked, their interpretations of the recorded conversations, and drug quantities involved.

### 1.    Clearly Established Supreme Court Precedent

A habeas petitioner's due process challenge to admission of evidence is limited to whether admission of the evidence "is so extremely unfair that its admission violates 'fundamental conceptions of justice.'"  *Dowling v. United States*, 493 U.S. 342, 352, 110 S. Ct. 668, 674, 107 L. Ed. 2d 708 (1990) (quoting *United States v. Lovasco*, 431 U.S. 783 790 (1977)).  Petitioner has not identified any relevant Supreme Court case governing the admission of an investigating officer's opinion interpreting what he or she observed or learned during a drug trafficking investigation.  Therefore, without any specific Supreme Court precedent, application of the due process standard is highly generalized.  In habeas review, "'[t]he more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations."  *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004) (alteration in *Richter*)).

## 2.    Highest Reasoned State Court Determination of the Claim

In 2013, the Appellate Division on direct appeal denied this claim, in relevant part, as follows.

> At the court's suggestion, the prosecutor then asked Hunter questions designed to qualify him as an expert and moved to have him so qualified.
>
> Counsel for both defendants objected on the ground that Hunter had not been identified as an expert prior to trial. The court did not advise the jury that Hunter was qualified as an expert and did not include Hunter in its charge on expert testimony.
>
> As a result, the admissibility of Hunter's testimony must be evaluated as lay opinion testimony. The testimony that elicited the objection concerned his statement that Perez gave McKinnon cocaine and that McKinnon would pay him for the cocaine after he received the proceeds for the sale, and his opinion that this was common in trafficking at higher weight.
>
> The intercepted conversations include statements by McKinnon regarding money he owed to Perez and his effort to collect money to repay him. Perez testified about this practice and the intercepted conversations as well. Thus, Hunter's first statement regarding the practice between Perez and McKinnon was one of fact, not opinion, and cumulative of the independent evidence that established that fact.
>
> Perez also testified that McKinnon, who purchased kilogram quantities of cocaine, was one of his best customers. This testimony, along with McKinnon's intercepted statements regarding quantities of cocaine, was sufficient to support a description of McKinnon as one who dealt in higher weight.
>
> However, an opinion that cast McKinnon's and Perez's arrangement as one that was common in drug trafficking

> at higher weight was not properly admitted as a lay
> opinion. We note that the statement was fleeting in nature.
> In light of the compelling evidence against McKinnon, we
> are satisfied that any error was harmless.
>
> In sum, the evidence of defendants' drug trafficking was
> compelling. None of the testimony challenged on appeal,
> some for the first time, had the capacity to lead to an
> unjust result.

(Ex. 9, Dkt. No. 6 at 50-51.)

### 3.    Analysis

Habeas review of a state court's admission of evidence is limited to whether

admission of the evidence deprived the petitioner of his due process right to a

fundamentally fair trial.  Based on clearly established Supreme Court precedent, a

fundamentally unfair trial is one that violates "'fundamental conceptions of justice

which lie at the base of our civil and political institutions,' *Mooney v. Holohan*, 294

U.S. 103, 112, 55 S. Ct. 340, 341, 79 L.Ed. 791 (1935), and which define 'the

community's sense of fair play and decency,' *Rochin v. California*, 342 U.S. [165,] 173

[1952]." *Dowling*, 493 U.S. at 353.  Such evidence must be viewed in light of any

instructions by the trial court.  *Id.*

The Appellate Division's determination that the challenged opinions were

largely corroborated by independent evidence, including the intercepted

conversations, and the testimony of Petitioner's drug supplier, Nasser Perez, is well-

supported by the record.  The Appellate Division identified only one instance of

opinion testimony that was not supported by independent evidence in the record,

that the arrangement between Perez and Petitioner was common in higher weight

drug trafficking.  The jury heard evidence that Petitioner distributed approximately a kilogram of cocaine per week, purchased for $21,000 to $24,000, which could be repackaged and sold for approximately $40,000.  A lay jury could fairly conclude this was "a higher weight" of drug trafficking.  Whether or not this was common in other drug trafficking organizations was immaterial to Petitioner's guilt, therefore, harmless error.

Petitioner also challenged Hunter's opinion testimony that an unidentified caller, in an intercepted conversation with Petitioner, was employed by Petitioner. The caller warned Petitioner that one of his customers might be working with the police.  In context of the charge that Petitioner violated N.J.S.A. § 2C:35-3, Leader of Narcotics Trafficking Network, the State was required to prove beyond a reasonable doubt that Petitioner was an organizer, supervisor or manager of at least one other person in a drug trafficking network.  The jury might have credited Hunter's identification of the unidentified caller as someone who worked for Petitioner in drug trafficking.

This was harmless error because there was sufficient evidence in the record, apart from this testimony, establishing the organizer, supervisor or manager element of § 2C:35-3.  Flick testified that Petitioner hired him to sell $50 and $100-bags of cocaine, and provided him with a cell phone and drugs.  Goodin testified that Petitioner hired him, through Scott, to sell drugs six days per week, and he sold to approximately 20 to 30 customers a day.  Based on this evidence alone, the jury could have found Petitioner supervised "one other person" in a drug trafficking

network.  Hunter's testimony was cumulative.  Therefore, the Appellate Division reasonably determined that admission of the evidence did not have the capacity to lead to an unjust result.  This finding is consistent with the conclusion that the admission of this evidence did not result in a fundamentally unfair trial in violation of the Due Process Clause.  Therefore, Ground Five of the petition is denied.

### G.    Ground Six of the Petition

In Ground Six of the petition, Petitioner alleges that the trial court's improper admission of voice identification evidence and the absence of a jury instruction on voice identification violated Petitioner's due process right to a fair trial.  (Pet., Dkt. No. 1 at 40-42.)  Hunter testified about a recorded conversation he attributed to Maddox and Petitioner, where they discussed how they could make more money selling ounces than by selling higher weights.  Hunter explained how he identified Gary Maddox's voice:  "I recognized the voice from prior overhears, all of the phone calls that the informant had placed to Gary Maddox.  I had been there.  I had listened to the voice of Gary Maddox, and that's how I recognized it."  Petitioner submits this did not explain how Hunter knew it was Maddox's voice, and this testimony prejudiced Petitioner on the conspiracy charge.

Petitioner also challenges Cornely's identification of the voice he heard on the intercepted calls on Petitioner's phone.  Petitioner explains that the State did not have voice samples to compare his voice with the voice heard on the tapes.  Without expert testimony, the trial court permitted the police officers to conclude it was

Petitioner's voice.  Petitioner asserts he was prejudiced because voice identification was crucial to his case.

Respondents oppose habeas relief on Ground Six of the petition.  (Answer, Dkt. No. 6 at 59-63.)  The evidence showed Hunter had personally spoken to Petitioner and recognized his voice on the recorded conversations.  Furthermore, Goodin and Perez knew Petitioner and Maddox, and they made in-court identifications of the defendants' voices in the recorded conversations.  In one recorded conversation, Petitioner identified himself by name, which permitted the jury to hear his voice and determine whether it was the same person in the other recorded conversations.

### 1.    Clearly Established Supreme Court Precedent

The Due Process standard discussed in *Dowling, supra,* governs Petitioner's constitutional challenge to the state court's evidentiary ruling.  Petitioner has not identified a factually similar Supreme Court case.

### 2.    Highest Reasoned State Court Determination of the Claim

In 2013, the Appellate Division denied this claim as follows.

> [D]efendants argue that the trial court erred in permitting testimony from Hunter and Cornely that identified their voices on intercepted conversations, and Hunter's identification of the informant's voice in recorded conversations.  An objection was made to Hunter's testimony identifying the informant's voice. Defendants argued that only the  informant could confirm it was his voice on the recordings, rendering Hunter's testimony as to what the informant and Maddox said hearsay. This argument lacks merit. Clearly, competent evidence of the

identification of a speaker is not limited to testimony by that speaker.

Pursuant to N.J.R.E. 701, a lay witness may identify the voice of a speaker, provided the witness's opinion "(a) is rationally based on the perception of the witness and (b) will assist in understanding the witness' testimony or in determining a fact in issue." See, e.g., State v. Perez, 150 N.J. Super. 166, 170 (App. Div.), certif. denied, 75 N.J. 542 (1977). Such testimony "is generally admissible provided that the witness has an adequate basis for comparison of defendant's voice with the voice which he identifies as that of the accused." State v. Johnson, 138 N.J. Super. 579, 582 (App. Div.) (citing Annotation, Identification of an Accused by His Voice," 70 A.L.R. 2d 995 (1960)), certif. denied, 71 N.J. 340 (1976); see also State v. Gallagher, 286 N.J. Super. 1, 16 (App. Div. 1995), certif. denied, 146 N.J. 569 (1996). To satisfy the first requirement of N.J.R.E. 701, the witness's "perception . . . [must] rest[] on the acquisition of knowledge through use of one's sense of touch, taste, sight, smell or hearing." McLean, supra, 205 N.J. at 457.

As the case agent, Hunter had extensive contacts with the informant and supervised the monitoring and recording of his conversations. Plainly, there was an ample basis for him to identify the informant's voice.

Defendants did not object to Hunter's identification of their voices at trial and now contend that the admission of this testimony was plain error. We note that identification was not a material issue in the case. See State v. Cotto, 182 N.J. 316, 325 (2005). The evidence included testimony from Perez, who identified both defendants' voices based upon his business relationship and friendship with defendants and participation in intercepted conversations; Goodin's identification of McKinnon; and defendants' self-identifications on the wiretap recordings. Indeed, the identifications were not challenged on cross-examination. Both Hunter and Cornely had numerous opportunities to listen to and become familiar with defendants' voices. The detectives heard intercepted telephone conversations in which defendants identified themselves. In addition,

> Hunter heard Maddox's voice in monitored conversations between the informant and Maddox that he was able to observe, and he spoke to defendants at the time of their arrests. We are therefore satisfied that the detectives' identifications of defendants' voices were properly based on their own perceptions. N.J.R.E. 701; McLean, supra, 205 N.J. at 457. Moreover, the testimony regarding the surveillance procedures, as well as the testimony of corroborating witnesses, supports the reliability of the identifications. The admission of this testimony was not error, let alone plain error.

(Ex. 9, Dkt. No. 6-11 at 61-63.)  In a footnote, the Appellate Division held:

> Cornely had an opportunity to become familiar with McKinnon's voice through his participation in the investigation.  Further, in light of McKinnon's self-identification on the intercepted conversations and the identification of his voice by both Perez and Goodin, any alleged error here clearly lacked the capacity to cause an unjust result.

(*Id.* at 61, n. 23.)

### 3.    Analysis

Habeas review of the Appellate Division's denial of the claim is limited to whether admission of the testimony deprived Petitioner of a fundamentally fair trial. The jury was instructed on making credibility determinations, including obligation to determine the weight to attach to the testimony of each witness (Ex. 48, Dkt. No. 6-50 at 40-42), and the definition of reasonable doubt.  (*Id.* at 39-40.)  There is nothing in the record to suggest the jury was incapable of applying these instructions to the evidence in the record.  Moreover, there was sufficient evidence in the record four the jury to credit testimony that the voices identified by Hunter and Cornely were the voices of Maddox and Petitioner.  Therefore, the Appellate Division's denial of this

claim did not involve an unreasonable application of the Supreme Court's due process standard described in *Dowling*. Ground Six of the petition is denied.

## H. Ground Seven of the Petition

In Ground Seven of the petition, Petitioner asserts his extended term sentence of life imprisonment, plus fifteen years violated his right to due process because the court erred in its analysis of the aggravating and mitigating factors. Petitioner further asserts his sentence, which exceeded that for intentional murder, is unconstitutionally excessive. (Pet., Dkt. No. 1 at 42-44.)

Respondents oppose habeas relief on Ground Seven. (Answer, Dkt. No. 6 at 63-67.) Sentencing issues are generally matters of state law that are unreviewable by habeas courts. Respondents recognize that a petitioner may challenge his sentence under the Eighth Amendment protection against cruel and unusual punishment, but they assert Petitioner did not invoke the Eighth Amendment in his habeas petition. Respondents urge the Court to deny Petitioner's sentencing claim because it is not cognizable on habeas review.

### 1. Clearly Established Supreme Court Precedent

Respondents are correct that the Eighth Amendment governs claims that a state court imposed an unconstitutionally excessive sentence. *See Harmelin v. Michigan*, 501 U.S. 957, 994-95 (1991) (holding mandatory life sentence without parole for first offense of possession of 650 grams of cocaine did not violate Eighth Amendment). The Appellate Division denied Petitioner's Eighth Amendment challenge to his sentence. Therefore, this Court will review the Appellate Division's

determination, although Petitioner cited the Due Process Clause and not the Eighth Amendment in his habeas petition.  Petitioner's challenge to the sentencing court's consideration of the sentencing factors is not cognizable on habeas review.  *Estelle*, 502 U.S. at 67–68 ("it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions.")

### 2.    Highest Reasoned State Court Determination of the Claim

The Appellate Division, in its 2013 Opinion on direct appeal, addressed Petitioner's Eighth Amendment sentencing claim as follows.

> In effect, his argument is that the imposition of consecutive sentences, which resulted in an aggregate sentence that exceeded the sentence for murder, constituted a violation of the Eighth Amendment. No authority is cited for the novel proposition that a defendant who commits multiple offenses may not be sentenced to an aggregate sentence that exceeds the sentence for murder. This argument is entirely lacking in merit.

(Ex. 9, Dkt. No. 6-11 at 81-82.)

### 3.    Analysis

In 1991, the Supreme Court held "the Eighth Amendment contains no proportionality guarantee." *Harmelin v. Michigan*, 501 U.S. 957, 965 (1991).  Instead, the Eighth Amendment was intended to outlaw certain modes of punishment. *Id.* at 976, 981-83.  "Severe, mandatory penalties may be cruel, but they are not unusual in the constitutional sense, having been employed in various forms throughout our Nation's history." *Id.* at 994-95.  Petitioner presented an Eighth Amendment challenge based on proportionality of his sentence, which is not cognizable under

clearly established Supreme Court precedent.  Therefore, Ground Seven of the petition is denied.

## III.    CERTFICATE OF APPEALABILITY

Unless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken from a final order in a proceeding under 28 U.S.C. § 2254. 28 U.S.C. § 2253(c)(1). A certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El*, 537 U.S. at 327. For the reasons discussed above, reasonable jurists would not find denial of the habeas petition debatable.  Accordingly, no certificate of appealability shall issue.

## IV.    CONCLUSION

Petitioner has not established his burden to show the state courts' determinations of his claims resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, or resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented.  Therefore, the Court will deny the habeas petition, and no certificate of appealability shall issue.

An appropriate Order follows.


**Date:  December 15, 2023**

<u>s/Renée Marie Bumb</u>
RENÉE MARIE BUMB
Chief United States District Judge